[L. A. No. 6422. Department Two.—March 18, 1921.]

PACIFIC WOOD AND COAL COMPANY (a Corporation), Appellant, v. GEORGE H. OSWALD et al., Respondents.

[1] APPEAL — ACTION ON CONTRACTOR'S BOND — AMOUNT OF MATERIALS FURNISHED AND USED — CONFLICT OF EVIDENCE — FINDING CONCLUSIVE.—Where, in an action to recover on a street contractor's bond for materials and supplies furnished to a subcontractor and alleged to have been furnished and used by him in connection with the work, the evidence was substantially conflicting as to the amount of the supplies which was used upon the work and the amount which was used upon other work, the finding of the trial court cannot be disturbed.

APPEAL from a judgment of the Superior Court of San Diego County. C. N. Andrews, Judge. Affirmed.

The facts are stated in the opinion of the court.

CLXXXV Cal.—21

Eugene Daney, Edgar I. Kendall and E. H. Lamme for Appellant.

Charles C. Crouch and Crouch & Chambers for Respondents.

SLOANE, J.—This action was brought by plaintiff to recover for materials and supplies alleged to have been furnished to one Jesse Knight, a subcontractor upon a street grading contract, and alleged to have been furnished and used in connection with the work contracted for.

The original contract was between the county of San Diego and George H. Oswald, and a certain portion of the work, namely, the grading and surfacing of a number of streets in road district No. 2 of the county of San Diego, in Normal Heights, a subdivision just outside of the city of San Diego, was sublet by the original contractor to the defendant Jesse Knight.

In connection with the execution of the original contract the statutory bond was given securing the payment for all labor, materials, and supplies "furnished for or used in connection with said work." The bond was executed by defendants George Oswald, as principal, and John G. Althouse, Tillie M. Althouse, J. M. Oswald, and N. C. Oswald, as sureties. The action is against the sureties on this bond and against the subcontractor, Jesse Knight.

The supplies and materials for which recovery is sought consist chiefly of hay and grain alleged to have been used in feeding the horses and mules, and coal for operating machinery and for camp uses, on the contract.

The liability of the sureties on the bond for supplies of this nature used in prosecuting the work was sustained in a former appeal in this action. (*Pacific Wood & Coal Co. v. Oswald et al.*, 179 Cal. 712, [178 Pac. 854].)

The items for which recovery is claimed cover a period of nearly two years from October 1, 1912, and aggregate the sum of $16,812.77, with payments credited of $12,348.80, leaving a balance for which judgment was demanded of $4,463.97.

The appeal is from a judgment in favor of the defendants.

The controversy on the appeal centers on the following finding of the trial court. The court finds:

"That during the progress of the said work the plaintiff sold and delivered to the said Jesse Knight for use upon said work, hay, grain, and supplies at the agreed price and of the reasonable value of $702.83 and no more. The court finds, however, that all of the materials sold and delivered or sold or delivered or furnished to the said Jesse Knight by plaintiff for use upon the said work, had been fully paid for by the said Jesse Knight prior to the commencement of this action."

It does not seem to be seriously controverted that the plaintiff sold and delivered substantially all of the supplies included in this action to Jesse Knight within the period specified. The dispute is as to the sufficiency of the proof that any greater amount or value than that found by the court was furnished for or used in connection with this contract.

The evidence on this point is certainly very confusing and unsatisfactory. It is conceded that Jesse Knight during this period of time was carrying on in his own name several other similar grading contracts in and about the city of San Diego, and was obtaining supplies of the same kind as charged in this account from the plaintiff for use on all of these contracts. Besides these personal ventures, he was engaged in other grading contracts in association with one or more partners, as "Jesse Knight and Company," to which partnership the plaintiff also furnished like supplies.

Some pains seems to have been taken by plaintiff in its bookkeeping to segregate the personal accounts of Jesse Knight from those of the Jesse Knight Company, but as between the various personal contracts of Jesse Knight there is very little to determine to what account the larger number of the items are properly chargeable. The statement of the account as set out in exhibit "A," attached to the complaint, sets forth the entire itemized claim sued on under a charge to "Jesse Knight, as subcontractor under George H. Oswald for certain work in Road Improvement District No. 2, San Diego County, California"; but when we turn to the record of the original entries from plaintiff's books they do not satisfactorily show the items as charged to this account. The exhibits from plaintiff's ledger account show the charges variously to "Jesse Knight, Grape

& Arctic," "Jesse Knight, Spreckels Building, Grape & Arctic," "Jesse Knight, Grape & Arctic, Coral," "Jesse Knight (Spreckels Bldg.) R. D. 2-98 K.," "Jesse Knight R. D. 2, 98 K," "Jesse Knight, Good Springs, Nevada."

From October 1, 1912, the beginning of the account sued on, the items in the ledger are charged to the address Grape and Arctic Streets, to the date February 24, 1913. From March 1, 1913, to June 21, 1913, they are charged to Jesse Knight (Spreckels Building), R. D. 2, 98 K, and from June 24, 1913, to February 28, 1914, to Jesse Knight, R. D. No. 2, 98 K. From the latter date to August 13, 1914, the charge is made to Jesse Knight, Good Springs, Nevada. The letters and figures, "R. D. 2," refer to road district No. 2 of San Diego County, and this Normal Heights contract is shown to have been in that district. But Jesse Knight appears to have been carrying on other contracts in this vicinity during the same period, some of which, at least, were in this district, and others were operated in the same neighborhood and from the same grading camp that served the Normal Heights job.

Practically all these various jobs which Jesse Knight was conducting in this vicinity and in widely separated sections of the city of San Diego required the same class of supplies charged to the account of this contract. It sufficiently appears that no supplies or materials furnished were used in furtherance of this contract excepting such as were finally delivered to the contractor's camp at Normal Heights, and defendants claim that much of the material delivered at this camp was for the use of other jobs.

There are certain items in this account initialed on the ledgers with the letters "N. H." The testimony on behalf of plaintiff is that these letters denote Normal Heights, and that they were entered from time to time, after the goods were bought and charged, by plaintiff's general manager, in the process of checking up the various items with Jesse Knight and by his authority. But Knight creates a conflict on this point by denying such ratification.

In fact, plaintiff's books are of little evidentiary value excepting as showing the general state of Jesse Knight's account with plaintiff without regard to any particular contract.

But even where the book account on its face shows items charged to the Normal Heights job, it furnishes but one element of the necessary proof to establish the liability of the sureties on the contractor's bond. Conceding that it is not required of plaintiff to show by direct evidence that every sack of barley, bale of hay, or load of coal furnished actually went into the furtherance of this contract, it is at least essential to show that it was furnished and delivered on the job for that use. Here, again, the proof seriously fails.

The evidence relating to deliveries traces very little of these supplies to the Normal Heights job. It is claimed by respondent, and we are unable to discover that such is not the fact, that the actual delivery to this job of any greater amount of supplies than as found by the trial court is not shown by the evidence. Plaintiff's witnesses do testify to certain deliveries which they actually followed to the grounds. But in most instances the goods were either called for and hauled away from plaintiff's warehouses by Knight's teams, or were delivered for his use at other points than the Normal Heights headquarters.

The state of the evidence on this point most favorable to the plaintiff company is that of its manager, Mr. Akerman. The uncertainty and indefiniteness of this proof is shown by some of his testimony. He says: "It was all delivered to the Normal Heights job or to Jesse Knight or his order, or to his teams at our warehouse yard. Once a month, I had a settlement with Jesse Knight and when that settlement was made and the account O. K.'d I would at the end of this month make a mark of some kind to indicate we had checked up the account and it was O. K'd up to that date. . . . It was by his checks that all these statements were made. You must remember he had four or five jobs on at that time. He had one at Point Loma. I think there were two at Point Loma. He had one at Grape and Arctic. He had one at 9th and C. He had one up near the reservoir, and then the Normal Heights job, and I think there were other smaller jobs at the same time, and he had a big feed corral down at 9th and I where he kept at times as high as one hundred mules. We delivered a good deal of stuff at 9th and I, to go to all the jobs. . . . The bulk of these supplies was taken from Fourth and K Streets, but

we also had a warehouse at 5th and University, some of it went from there, and I think we drew some from 26th and Logan, we have a warehouse there. . . . In some cases we delivered the grain, in other cases he hauled it away. In some cases we would sell in cars and he would come and unload them and haul them to the various jobs. . . . I know this, that we would get the order to deliver so many sacks of grain for a certain job, and deliver it to Normal Heights, if he was busy, or deliver it to Grape or Juniper or Point Loma, or he would say, 'I will come and call for it; or put it on my wagon and I will haul it myself.' Every kind of delivery conceivable was made during the time we were working on those jobs and selling Jesse Knight these goods. The only thing we have to show where any of these goods were delivered are the entries on our books, and my knowledge of checking up with Jesse Knight on these various jobs. The tickets were all checked up monthly with Jesse Knight and after they were checked up for the various jobs the tickets were destroyed.''

There was much more testimony by Mr. Akerman but to the same effect.

It is apparent that plaintiff relies principally for the accuracy of its charges to the Normal Heights job upon the alleged checking up of these accounts from month to month with Jesse Knight.

This might, *prima facie,* be sufficient but for the fact that Jesse Knight testifies that he did not check up these accounts with plaintiff, or designate the items chargeable to the Normal Heights contract. He had testified regarding these matters substantially as follows: ''I did not instruct Mr. Akerman about the 15th of October, 1912, to charge all feed after that date to the Normal Heights' job. I don't think he knew when I took it really. It was just one continuous account. I have never been out of his debt since I have been in the country that I know of. . . . I paid for all the stuff that I used on Normal Heights and more too. . . . I generally made the deliveries of the grain I bought from the plaintiff myself. The grain at Normal Heights I sent my own truck for and that which was delivered over there and used there. Q. Did you go down once a month and have statements checked up with Mr. Akerman and tell him this was to go there and that was to

go there and so forth. A. No. We did not do that. It was just a running account. I would get it there when I could and pay him when I could and it was just a running account all the time." On cross-examination of Jesse Knight by plaintiff's attorney this testimony was elicited:

"Q. Is it a fact that you and Mr. Akerman, say on an average of once a month, met and went over your different statements and tags and distributed them to the particular account to which they belonged. A. No, sir, I never had time for that. Neither did he.

"Q. Didn't you meet about once a month and determine where the different items belonged? A. No, sir. What have I a bookkeeper for? I never bothered with that kind of stuff.

"Q. Did you ever go down to his place of business? A. Yes, sir, I have been there hundreds of times.

"Q. Did you at any time while you were there discuss your account? A. Yes, sir; we used to get the gloves on occasionally and go round and round.

"Q. Did you go over the items of the various accounts? A. No, sir. Not in detail. We never went into that. It was a general proposition. He thought the load was getting too heavy and I knew it was. . . .

"Q. Did you ever know that Mr. Akerman or his company was attempting to keep separate accounts of the different jobs, of what went in from their place to the different jobs? A. Oh, no, they couldn't do that. They didn't know when I took a job and when I didn't. We had Jesse Knight Company and Jesse Knight, that is all."

[1] While the testimony of Jesse Knight was quite as vague and uncertain in many particulars as that of the plaintiff's witnesses, and there was much to weaken the force of his testimony, it was sufficient to raise a substantial conflict as to the alleged method of segregating the items on the various contracts, and we are not at liberty to question the findings of the trial court based on such evidence. Moreover, there were many inaccuracies in the items of account as shown on the books charged to the account sued on. Throughout the account numerous charges occur of coal in considerable quantities for use in a steam shovel, whereas, the only steam shovel on this job was an oil-burner. In further illustration, a charge of January 21, 1913, for nine-

teen bales of alfalfa was posted from a blotter entry which was marked "9th and I chg. Evans." February 5, 1913, twenty sacks white oats marked "9th and I. Chg. & paid by J. Spragel." There are some thirty-five or forty of these charges aggregating hundreds of dollars which respondent apparently has shown to have been delivered to other accounts than the one sued on.

This, with the other matters pointed out, further discredit plaintiff's evidence, and we think justify the court in rejecting all items not explicitly shown to have been delivered for consumption on this contract.

We are not prepared to question the finding of the court that only items to the value of $702.83 were specifically traced for use on this job, so far as evidence of their sale and delivery for that purpose is affirmatively shown.

It was admitted by Jesse Knight that a large proportion of all the supplies for his horses and mules used on the Normal Heights contract was furnished by the plaintiff company, and this must have run into thousands of dollars in value. But the evidence also shows that thousands of dollars were paid on account.

The witness Granger, who was financing Knight on this contract, testified that he watched the job very closely, and knew where the grain was delivered and knew when the bills were rendered and put up the money for them, and that along the latter part he would not allow Knight to give a check unless he O. K.'d it, and that he gave checks for this grain and O. K.'d them. Summing the matter up, he testified: "I put up the money and Jesse Knight made the checks and I O. K.'d them for this grain that was furnished by Mr. Akerman, I remember that."

The plaintiff credits defendants with payments on account of supplies furnished for use on this contract in the sum of $12,348.80. It may be conceded, therefore, that supplies to that amount were actually furnished and used. In order to recover anything in this action the plaintiff must furnish satisfactory proof that it sold and delivered to the use of this special contract supplies in excess of that amount. In view of the finding of the trial court that it can trace under the evidence materials only to the value of $702.83 to this job, and that "all of the materials sold or delivered or furnished to Jesse Knight by plaintiff for use upon the

said work had been fully paid for,'' and the admitted payments exceeding twelve thousand dollars, and with the general declarations of defendants' witnesses that all payments for such supplies had been made, we find ourselves unable, under the record here, to find proof of an unsatisfied balance on this account.

It may be conceded that the same degree of certainty in tracing the materials furnished into the actual application to the work under the contract is not required or perhaps possible under the law governing this class of contracts as would be required in the case of mechanics' liens, where the materials furnished enter into and become part of the structure.

Here, the sureties became liable for materials and supplies which contributed to the carrying on of the work. Feed furnished to the contractor's mules and horses used in prosecuting the work would be chargeable to this account, though delivered and used miles from the actual scene of operations. But it is incumbent upon the plaintiff to satisfactorily prove that all of the materials charged were delivered and used, or, at least, contracted for the promotion of this specific job, and although it is clearly established that some of the items of this account were so contracted and used, and it is apparent from the admissions of defendants that much more of the materials than were specifically traced to the job were actually received and used, it would be purely a conjecture to find that there had been materials furnished in excess of those covered by the credited payments.

This is one of the class of cases peculiarly difficult to review from the printed transcript. The trial court was in a much better position to unravel the intricacies of this confused account than this court can possibly be, and in view of the substantial conflict in the vital point in this controversy, as to the identification of the items properly chargeable to the defendants, we cannot disturb the conclusions of the court that there is nothing due the plaintiff.

The judgment is affirmed.

Wilbur, J., and Lennon, J., concurred.